IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNT OF **DEANDRE RODGERS FACEBOOK USER ID "RICH DRE," PROFILE LINK WWW.FACEBOOK.COM/DEANDRE.RODGERS.90** THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | Case No. ___22-SW-244___<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **Chase Cogswell**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I have been employed with the ATF since 2018.  I have my Bachelor's Degree from Radford University with a Criminal Justice major.  Prior to working for the ATF, I was employed as a police officer with the Savannah Police Department from January of 2010 to July of 2018 with approximately 6 years

of that being in an investigative capacity.  During my employment as a law enforcement officer, I have received various training and participated in numerous investigations involving drug trafficking and violent crime.  During the course of my career, I have been involved in a variety of investigations ranging from simple possession of narcotics and firearms to complex conspiracies. Additionally, during my career as a law enforcement officer, I have been involved in narcotics seizures, and have participated in the execution of numerous search and arrest warrants.  I have conducted investigations of unlawful drug distribution and importation in violation of 21 U.S.C. §§ 841(a) (1), and firearms related offenses in violation of 18 U.S.C. §§ 922(g) and 924(c) and have conducted or participated in wire and physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of informants, and reviews of taped conversations and drug records.  Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, distributed, and the methods of payment for such drugs.  I have also become familiar with the methods of laundering the proceeds of narcotics trafficking.  Based on my training and experience, I am familiar with the manner in which controlled substances are imported, manufactured and distributed including, but not limited to (a) methods of distribution of narcotics; (b) the use of telephone communication devices; (c) the use of numeric codes and code words to discuss drugs and money, to identify individuals, and to conduct drug-related transactions; and (d) the common practice of registering for and obtaining these communication devices under fictitious names, or names of relatives and/or friends to avoid financial responsibilities and tracking of criminal activities by law enforcement entities.

3.      Throughout my training as a Special Agent with the ATF, I was trained to conduct physical surveillance, interview sources of information and defendants, serve and review telephone subpoenas, serve search warrants and arrest warrants, investigate firearms and narcotics

2

trafficking, National Firearms Act (NFA) violations, Hobbs Act violations, undercover firearms and narcotic investigations, and the interception of wire communications. Further, I have been trained to testify in judicial proceedings in federal court involving prosecutions relating to violations of federal firearms laws. I routinely refer to and utilize these laws and regulations during the course of my official duties. I am currently assigned to ATF Memphis Group III. My duties include the investigation of violations of the federal firearms laws and regulations occurring within the Western District of Tennessee.

4.      The facts in this affidavit come from my personal observations, my training and experience and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## **PROBABLE CAUSE**

5.      Beginning in January of 2020, Special Agent Chase Cogswell of the Bureau of Alcohol, Tobacco, Firearms, and Explosives began a VICAR investigation into the crimes of violence committed by members of the Ghost Mob Unknown Vice Lords.  Based on his investigation several Unknown Vice Lords have been indicted, and Agent Cogswell has conducted proffers with these charged defendants.

6.      Based on the ongoing gang activity and violence associated with UVLs, SA Cogswell continued the investigation into the organization and its members.  SA Cogswell learned the following about murdered Vice Lord members:

7.      <u>Murder of Ronald Terry and Candid Sanders:</u>  On January 11, 2019, Ronald Terry AKA "Big Pokey" was shot and killed while in the car with a female, Candid Sanders.  Terry and Sanders were in the front of Terry's vehicle, and both were shot in the back of the head.  Terrance Tapplin (self-proclaimed UVL member) stated that he was in the back seat of Terry's car when

3

Timothy Johnson, also known as "Lil Hit," shot and killed both Terry and Sanders. Terry was the former chief of the Memphis Unknown Vice Lords. Terry and Sanders murders are currently unsolved.

8.       Murder of Cortez Jones: On January 13, 2019, Cortez Jones' residence was shot over 90 times at 5931 Hickory Leaf Cv, Memphis, TN. Jones was killed in the shooting, and another resident was shot but survived. Shortly before being murdered, Jones received a text message that said "Aye bruh, you need to call me asap. I told you about the goal and you didn't answer or call you in violation." (Note: Goal is slang for a meeting of Vice Lords, and stands for "Gathering of all Lords"). This murder is currently unsolved.

9.       Murder of Timothy Johnson: On January 15, 2019, Timothy Johnson AKA "Lil Hit" was shot many times and killed at 1828 Victoria Dr, Memphis, TN. Shell casings from this murder were linked through ballistic analysis to shell casings on the scene of the Cortez Jones murder – the same weapon was used on both, a .223 caliber rifle. Multiple firearms were used at both murders. Terrance Tapplin provided a statement about this murder that he last saw Johnson at the residence of "Chuck," who was later identified as Demarcus Howell. Tapplin saw Johnson between 8 and 10 PM on the night of Johnson's murder. Johnson was with four other UVL members at the time, one of whom was Ronald Terry's brother, known as "Hit" or "Hitman." Another UVL with Johnson before his murder was "Dre," who has been identified as Deandre RODGERS. The other two UVLs Tapplin did not know. Johnson left Howell's residence with RODGERS, "Hitman," and the two other UVLs. Tapplin said that everyone in the group had a gun. Tapplin identified Antwone Terry as "Hitman" from a photographic lineup, and said that he drove the vehicle. Tapplin stated that Johnson's murder was ordered by Brandon Morton, also known as "Lil B," and Morton is Ronald Terry's son. Tapplin stated that Morton can order murders since his father was the Chief UVL.

4

10.     The recovered shell casings from the above murders were linked to multiple other shooting scenes in both Memphis and Knoxville, TN.  UVLs are known to move firearms out of the area once they become "hot," or have been used in a violent crime.  Based on the above, Agent Cogswell began an investigation into Deandre Rodgers.

11.     The following is the driver's license photograph for Deandre RODGERS. RODGERS was arrested for Aggravated Assault in 2015, plead guilty in 2017, and was removed from diversion and became a convicted felon during 2019 (Indictment number 15-06384).



12.     During February of 2022, an ATF Confidential Informant (CI) was in contact with RODGERS.  RODGERS offered to sell the CI a 9-millimeter pistol, and provided the CI with a photograph of the pistol for sale.  This communication was furnished to SA Cogswell.

13.     During July of 2022, RODGERS informed the CI that he was living in the Tulane Apartments, Memphis, TN.

14.     During an interview during July of 2022, Taria Gaters, the wife of UVL Chief Terance GATERS, discussed Facebook user "Richghost Dre" as being an active UVL.

15.     SA Cogswell located RODGERS Facebook page:  Richghost Dre.  On this Facebook page, SA Cogswell found photographs of RODGERS holding weapons and openly representing himself as a UVL.



1:56

Richghost Dre

**Richghost Dre**

Rich Ghost 5L
Shunna Ig:Richghost500dre

Friends | Message | ...

Lives in Memphis, Tennessee

From Memphis, Tennessee

Single

RichGhost500dre

m.youtube.com/watch?v=DpSexbghZ7U

Home   Marketplace   Gaming   Feeds   Notifications   Menu

6





8



16.    On July 20, 2022, RODGERS posted a photograph of himself holding a Draco,

which is an AK-47 style pistol.



17.     SA Cogswell also saw a photograph that RODGERS posted on Facebook on June

27, 2022.  RODGERS brandished weapons in front of an apartment building door.  On July 21,

2022, SA Cogswell drove through the Tulane Apartment Complex and confirmed that this

photograph was taken in that complex.  By looking at the reflection in the door behind RODGERS

and the damage to the bricks on the right side of the door, SA Cogswell was able to confirm that this picture was taken in front of 4805 Farris Circle, Memphis, TN.  SA Cogswell could also tell that, given that this is an outward opening door, it is likely not the door to the apartment but rather to the interior of the building only where there will be more apartment doors.



18.     On July 21, 2022, while on surveillance, SA Cogswell observed a black Nissan Altima with a temporary tag park in the parking lot.  RODGERS and a female exited the vehicle and walked into 4805 Farris Circle.



19.     On July 21, 2021, SA Cogswell spoke with the apartment manager and showed her a photograph of RODGERS. She did not recognize him but contacted her maintenance worker. The maintenance worker came to the office, and SA Cogswell showed him the photograph. The man stated that RODGERS lives at 4805 Farris Circle, Apartment 102. The man stated that on Friday, July 15, 2022, RODGERS pulled a gun on a tow truck driver in the Tulane Apartments. RODGERS forced the driver to put down the car he was trying to tow, and the driver left.

20.     During the morning of July 21, 2022, the maintenance man saw RODGERS run from 4805 Farris Circle and get into a white SUV. RODGERS was carrying an AR-style rifle with a buttstock.

21.     On July 21, 2022, the manager looked up the leaseholder for 4805 Farris Circle, Apartment 102 and found it to be Ronisha Terry. SA Cogswell knows this to be the daughter of deceased UVL Chief Ronald Terry. One of the children listed on the lease is Deandre Rodgers Jr. RODGERS is not on the lease.

22.     On July 26, 2022, United States Magistrate Judge Annie T. Christoff found probable cause and gave law enforcement permission to enter the residence at 4806 Farris Circle, Apartment 102 (22-SW-196).

23.     On July 29, 2022, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), Memphis Office, executed the above federal search warrant at the residence of Deandre Rodgers and Ronisha Terry.  At approximately 6:30am, ATF Special Agents (SA) began the initial search warrant process, specifically at the front facing exterior main entry door. ATF entry team utilized the "knock and announce" approach to notify potential occupants of their presence and their reason for being at this location.  ATF entry team utilized entry tools to defeat the exterior door at the front entrance. This process also involved a designated MPD vehicle with blue emergency lights and audible siren initiated as well.

24.     Once ATF entry team members gained access to the front entryway of the apartment, announcements were made for any potential interior occupants to come to the front of the house. ATF entry team did not locate anyone inside the residence.  ATF SA Emily Knox generated entry and exit videos as well as photographs.  SA Kyle Williams collected evidence during the search warrant execution.

25.     Located in the Master Bedroom of the residence (bedroom at the end of the hall, on the left side) was the following:

- One (1) Pro Mag extended magazine with ammunition (inside a Louis Vuitton shoulder bag on the bed);
- Twenty-two (22) 9mm bullets from inside the extended magazine; and,
- A box of 9mm ammunition with seven (7) bullets (inside a Louis Vuitton shoulder bag on the bed).





14

26.     Various indicia of residence were found throughout the residence. Agent Cogswell identified several pieces of mail in Deandre Rodgers' name.   In addition, a Minnesota Timberwolves basketball jersey was located on the bed in the Master bedroom. The Timberwolves jersey matched a jersey Rodgers wore on a June 27, 2022 Facebook Post.



27.     Located in the rear right bedroom of the residence was one (1) loose 223 Caliber round of ammunition (inside a shoe box, inside the closet).  The search warrant process ceased at approximately 7:25am. Upon conclusion of the search warrant, ATF left a copy of the search warrant and ATF property inventory receipts at the residence.

28.     Ronisha Terry called SA Cogswell in the hours following the execution of the search warrant, and agreed to voluntarily come to the Multi-Agency Gang Unit to be interviewed. Ms. Terry and RODGERS arrived, and contacted SA Cogswell when outside.  SA Cogswell let them in, and spoke with each. These interviews were audio and vide recorded.

29.     RODGERS stated that he did not own the ammunition in the bag, and that it belonged to Ms. Terry.

30.     Ms. Terry stated that the ammunition in the bag belonged to RODGERS. She stated that it is his bag, she has never seen the extended magazine before, and she saw him put the orange box of bullets in the bag several days before and leave with the bag during an argument. Ms. Terry stated that the box of bullets is RODGERS' property, and is normally on top of the fridge, but that he had placed it in the bag approximately a week ago.

31.     SA Cogswell learned RODGERS and Terry had just began working at FedEx, and they went to work just before the search warrant was executed. Specifically, Agent Cogswell learned that Rodgers and Terry begin work at 6 AM, and they leave their residence by 5:15 AM.

32.     On July 29, 2022 at 11:04 AM, SA Cogswell received a phone call from 662-874-4293. The caller identified himself as RODGERS, and SA Cogswell recognized his voice as belonging to RODGERS. RODGERS stated that the ammunition in the bag belongs to him, and that he had to be honest. This call was not recorded, as SA Cogswell did not expect it.

33.     Several days later, SA Cogswell contacted Ms. Terry by phone and asked to speak with RODGERS. RODGERS got on the phone. SA Cogswell asked RODGERS why he called back about the bag, and he stated that he just had to be honest about it. This call was recorded.

34.     SA Cogswell learned that RODGERS had changed his Facebook profile name to Rich Dre. SA Cogswell observed that it was the same Facebook profile with the same profile link.

35.     On August 7, 2022, RODGERS posted a picture of himself on Facebook throwing a gang sign and wearing a "4QG 4th Quarter Gang" shirt. He also utilized the hashtag "#RenegadeBusiness 18-22-12." This stands for "Renegade Vice Lords." R is the 18th letter, V is the 22nd, and L is the 12th.

16



36.     On August 10, 2022, RODGERS posted a photograph of himself wearing a "4QG

4th Quarter Gang" shirt and pointing (2) firearms at the camera.  This photograph was taken in the

Tulane apartments, and appears to be in front of 4805 Farris Circle, Memphis, TN.

17



37.     On August 11, 2022, a federal grand jury sitting in the Western District of Tennessee issued a two-count indictment against Deandre Rodgers for the following: convicted felon in possession of ammunition, in violation of 18 U.S.C § 922(g)(1), and possession of ammunition after previously being convicted of a misdemeanor crime of domestic violence/ bodily harm.  An arrest warrant for Rodgers' arrest was issued.  The case number is 22-CR-20189-SHL. Agent Cogswell anticipates executing the arrest warrant within the next week.

18

38.    On August 11, 2022, SA Cogswell confirmed that Ronisha Terry had active utilities through MLGW at 4805 Farris Circle, #102, Memphis, TN.

39.    In addition, on August 11, 2022, SA Cogswell conducted surveillance at 4805 Farris Circle.  Agent Cogswell saw a black Nissan Altima in the parking lot.  This is the same Nissan Ultima that Agent Cogswell observed RODGERS and Terry exit out of on July 21, 2022. The temporary tag was different.  Agent Cogswell recognized the vehicle because of its unique identifiers which included a fur covered steering wheel and uncommon rims.  Agent Cogswell obtained a second search warrant for Rodgers' residence.

40.    On August 16, 2022, ATF agents executed a second federal search warrant at 4805 Farris Circle, apartment 102, Memphis, Tennessee.  At approximately 5:40 am, ATF Special Agents on surveillance observed Rodgers and Terry exit the front door of the apartment. ATF SAs approached and arrested Rodgers without incident. Ms. Terry informed SAs that her brother, Reginald Terry, and her two young children were still inside the apartment.

41.    On August 16, 2022, at approximately 5:45 am, ATF SAs began the initial search warrant process at 4805 Farris Circle, apartment 102, Memphis, Tennessee, specifically at the front facing exterior main entry door. ATF entry team utilized the "knock and announce" approach to notify potential occupants of their presence and their reason for being at this location. ATF entry team called out to Reginald Terry, and SAs opened the front door after knocking and waiting a reasonable amount of time utilizing Ms. Terry's key, which she provided. Reginald Terry exited the residence and stated that two young children were still inside.

42.    ATF personnel initiated the search phase of the search warrant process  at approximately 6:00 am.  ATF SA Emily Knox generated entry and exit videos as well as photographs of 4805 Farris Circle, apartment 102, Memphis, Tennessee. SA Kyle Williams collected evidence during the search warrant process.  Agent Cogswell found on top of a cabinet

in the kitchen, one Glock Model 22 .40 caliber pistol with an extended magazine. The firearm was loaded with 17 rounds of .40 caliber "Blazer 40 S&W" ammunition in the magazine, and one round in the chamber. Agent Know located in the living room couch n iPhone cell phone with a red back. The defendant was arrested and he was transported to MGU. Rodgers was advised of his rights and declined to make a statement.

43.     RODGERS is a convicted felon. He failed to complete his diversion from his 2015 Aggravated Assault case, and was found guilty on July 27, 2019, for Aggravated Assault, Domestic Assault, and weapons violations. On November 15, 2019, he was sentenced to 3 years in corrections. RODGERS is prohibited from possessing firearms due to his felony conviction for Aggravated Assault.

44.     As documented in the affidavit, RODGERS poses with firearms on Facebook while prohibited from possessing them.

45.     According to federal law, individuals who have been convicted of a felony and misdemeanor crimes of domestic violence, such as RODGERS, are prohibited from possessing firearms and ammunition. Based upon my knowledge, training, and experience, I know that convicted felons and other prohibited persons often utilize the illicit market to obtain firearms, to include friends, and others to obtain firearms on their behalf. Convicted felons and other individuals who obtain firearms on the secondary or illicit market may exchange firearms for U.S. currency, other firearms, and/or narcotics. Based upon knowledge, training, and experience, I know that convicted felons and others often utilize Facebook messenger and other mediums to obtain firearms in order to avoid detection from law enforcement.

46.     During July of 2022, I submitted a preservation request for the Target Account with Meta/Facebook through the Facebook Law Enforcement Portal.

47.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

48.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

49.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

50.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

51.    Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

52.    Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes.  Users can "tag" other users in a photo or video, and can be tagged by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

53.    Facebook users can use Facebook Messenger to communicate with other users via text, voice, video.  Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. of the date of each call.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

54.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

55.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or

content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

56.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

57.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

58.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

59.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

60.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

61.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

62.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service

23

(including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

63. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide

24

relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

64.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

65.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

66.     Based on the foregoing, I request that the Court issue the proposed search warrant.

67.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

25

68.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## REQUEST FOR SEALING

69.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

**Respectfully submitted,**

Chase C. Cogswell
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

Pursuant to Federal Rule of Criminal Procedure 41(d)(3), the undersigned judicial officer has on this date considered information communicated by [ ] telephone or [ ] other reliable electronic means or [X] both, in reviewing and deciding whether to issue a search warrant. In doing so, this judicial officer has placed the affiant under oath and has confirmed by speaking personally with the affiant on the telephone [X] that the signatures on the search warrant application and affidavit are those of the affiant or [ ] that the affiant has authorized the placement of the affiant's signatures on the application and affidavit, the documents received by the judicial officer are a correct and complete copy of the documents submitted by the affiant, and the information contained in the search warrant application and affidavit are true and correct to the best of the affiant's knowledge.

SUBSCRIBED and SWORN to before me on _August 29_____, 2022

_____
**HONORABLE ANNIE T. CHRISTOFF**
**UNITED STATES MAGISTRATE JUDGE**